PLIBRICO JOINTLESS FIREBRICK CO. v. CAIGAN et al.

No. 3147.

District Court, D. Massachusetts.

Dec. 9, 1930.

R. G. Dodge, John M. Raymond, and Storey, Thorndike, Palmer & Dodge, all of Boston, Mass., for plaintiff.

I. Caigan, of Boston, Mass., for defendant.

MORTON, District Judge.

This is a suit to restrain the defendant from various forms of alleged unfair competition. It was heard in open court. The facts are as follows:

The business in question is that of selling fire clay for use in lining boiler furnaces. Such furnaces are sometimes lined with fire brick set in mortar, and sometimes with fire clay. In the latter case the clay is used in a condition sufficiently moist to be workable and adherent. Such linings can be shaped to forms and are referred to as "pliable," in distinction from brick linings.

The plaintiff's business began as early as 1914 under the name "Pliable Firebrick Company." In 1924 this name was changed to "Plibrico Jointless Firebrick Company," which it still retains, "Plibrico" being a coined word. The plaintiff's business is said to amount to more than $1,250,000 a year and its product to be sold all over the world.

The real defendant is Israel Caigan. He owns substantially all the stock of the other defendant; and he also does business under several other trade-names which he has registered with the city halls at Boston and at Worcester, viz.: Boiler Furnace Construction & Repair Corporation, "Flint-Clay" Pliable Fire Brick Company, and Caigan Engineering Equipment Company, and perhaps others. Caigan testified that in 1920 he was in the business of selling pliable linings at 110 State street, Boston; and that by arrangement between him and the plaintiff in that year he undertook the sale of its product. The plaintiff's name was put in the telephone book in both the alphabetical and business indexes at the State street address; and in other ways its goods were advertised in the New England territory, the advertisements referring to said office and telephone. After a few years the relations between the parties became unsatisfactory to the plaintiff, and under date of September 8, 1925, it gave the defendant sixty days' notice of the termination of them, which accordingly took place on November 8, 1925. The acts complained of have occurred since that time.

The plaintiff then put other representatives into this field and continued to advertise its goods here. But it seems not to have given any widespread notice that Caigan had ceased to represent it. Caigan at once took on another line of fire-clay linings and pushed actively for the business. In the years immediately following his separation from the plaintiff, he received from time to time orders for Plibrico from persons who supposed that he was still selling it. These orders he filled with his own product "Flint-Clay." He billed it in that name. If any objection was made by the buyer, he explained that it was not Plibrico but was as good or better. It is not easy to prove a course of business of this sort; but from the instances which the plaintiff has been able to establish I have no doubt that the facts are as above stated, and that Caigan's regular course of business, after separating from the plaintiff, was to endeavor to fill all orders for "Plibrico" which came to him with "Flint-Clay" and not to mention the difference unless it was called to his attention by the purchaser; and I so find.

The package in which "Plibrico" was put out was an iron drum painted red with the name stenciled in white. Caigan put out his "Flint-Clay" in the same sort of drum painted a darker shade of reddish brown and stenciled in white with the name "Flint-Clay" and other information. The stenciling was put on differently from that on the plaintiff's drum, and the two packages were not likely to be mistaken for each other. The plaintiff used as a sort of trade-mark a cut of its drum with two mason's tools at the foot of it. The defendant adopted the same sort of cut with *three* mason's tools at the foot of the drum. In his advertising the defendant closely imitated, although he did not copy, certain cuts originated by the plaintiff to show how Plibrico was worked and applied to various uses. These cuts were not trade-marks in the sense that they were associated in the public mind with the plaintiff's goods; they were descriptive of the way in which it—or any clay furnace lining—was applied, and they illustrated how much easier it was to use than bricks; the idea of such cuts originated with the plaintiff. The defendant made certain installations using his product "Flint-Clay" in which the buyers supposed that they were getting "Plibrico." One such instance was proved in which "Flint-Clay" failed in service and the user attributed the fault to "Plibrico." While the evidence on the point is not very clear because it is a difficult thing to prove, it seems to me distinctly probable that the reputation of "Plibrico" in the trade using it was injuriously affected by the defendant's acts. And I so find.

■ I believe that after separating from the Plibrico Company the defendant meant to take every possible advantage of his former connection with it in furthering the sale of his own product, and to go as far as he could in underhand practices in that direction without getting caught. He intentionally and fraudulently substituted his own goods for "Plibrico" whenever he had what looked like a safe opportunity to do so; and in furtherance of his general purpose, he ·adopted a somewhat similar package and very similar advertising matter. His imitation of the plaintiff's drum-and-tools trade-mark must have been intentional and was certainly fraudulent. I find the facts accordingly. The defendant's chances for such fraudulent practices have become less as time has gone on, but I see no reason to believe that his will and intent have changed. In my opinion the plaintiff is entitled to an injunction protecting·it against a recurrence of such unfair and illegal competition, and also for damages for the defendant's past conduct.

As to the defendant's cross-bill: The defendant included in his answer a cross-bill in which he alleges:

(1) That the plaintiff maliciously interfered with his telephone service.

(2) That the plaintiff maliciously used a name similar to that of the defendant's Boiler Furnace Construction & Repair Corporation.

(3) That the plaintiff has since November 8, 1925, falsely and maliciously stated that the defendant Caigan was still connected with the plaintiff.

(4) That the plaintiff in the fall of 1928 falsely and maliciously stated to a customer of the defendant that certain repairs which in fact had been made by the defendant had been made by the plaintiff and by this misstatement obtained said customer's business.

(5) That the plaintiff submits bids and accepts contracts at ruinous prices for the purpose of forcing the defendant out of business and thereby obtaining a monopoly in the sale and installation of this product.

(6) That the plaintiff has made slanderous and libelous statements about the defendant.

(7) That the plaintiff has maliciously caused a customer of the defendant to break a contract with him.

(8) That the plaintiff has assisted concerns not connected with it who were in litigation with the defendant for the purpose of damaging the defendant.

■ No evidence whatever was introduced by the defendant tending to prove the first, third, fourth, fifth, and seventh of these charges. As to the second the plaintiff did organize a subsidiary called the "Boiler Brick Repair Company." It did so in entire good faith and without any purpose or intent to interfere with the business which the defendant carried on under the name "Boiler Furnace Construction & Repair Corporation." The names are so dissimilar that there was no danger of the public being confused by them. And there is no evidence that any such confusion actually occurred. The plaintiff was within its rights in using the name which it did use. On objection by the defendant, however, it promptly abandoned it. I find that this charge is not sustained.

The sixth charge is based solely, as the defendant admits, on a letter dated August 29, 1928, which the plaintiff wrote to the Boston Better Business Bureau in an effort to prevent unfair competition by the defendant without recourse to legal proceeding. I am not satisfied that any of the statements in this letter were untrue, nor that they were maliciously made. This charge also is not sustained.

The eighth charge is based on the fact that one Grant, employed by the plaintiff, testified for the opposing party in a lawsuit against the defendant. There was nothing that could properly be called evidence in support of this charge. I find that it is not sustained.

As a whole, the defendant's charges contained in its cross-bill may be properly characterized as reckless and unfounded charges of fraud such as have been often and strongly judicially disapproved. The cross-bill should be dismissed, with costs on the highest scale legally permissible.

■ The plaintiff is entitled to an injunction under the first, second, and third prayers of the bill. It is also entitled to an injunction under the fifth prayer in so far as the cut of the drum is concerned, but not, I think, as to the descriptive photographs. The plaintiff is also entitled to an injunction by way of equitable attachment under the seventh and eighth prayers of its bill. As to the fourth prayer, none of the names under which the defendant has done business which are here listed is so similar to the plaintiff's name as to create any confusion in the trade. The defendant in effect admitted in his testimony that he had tried to register all likely names applicable to his business in which the words

"pliable," "jointless," and "plastic" occurred. That he would not be protected in equity in his effort is entirely probable; but it does not give the plaintiff a right to an injunction against such practices.

Decree accordingly.